**C. Hobart MILLS et al., Appellants,**

v.

**Henry BROUGHTON et al., Appellees.**

Court of Appeals of Kentucky.

Sept. 28, 1962.

Rehearing Denied March 22, 1963.

Robert J. Watson, Middlesboro, for appellants.

Charles G. Cole, Jr., Barbourville, for appellees.

STEWART, Chief Justice.

This appeal is from a judgment of the Knox Circuit Court, decreeing it was impossible to determine the will of the voters in the general election held in Knox County on November 7, 1961, in Upper Stinking Creek Precinct #6, and that no legal election had been held in that precinct.

This ruling obliterated the majority of votes received by Mattie Mills, C. Hobart Mills, and Garrett Brown, the Democratic candidates in the order named for jailer, magistrate and constable, who are appellants herein and were the contestees in circuit court, and declared duly elected to the respective offices Lester Broughton, Henry Broughton and Clark Sizemore, who were the Republican candidates and the contestants below.

The basis for the election contest brought by the apparently unsuccessful Republican candidates was that at this particular precinct the secrecy of the voting procedure was not preserved, as required by Section 147 of the Constitution of Kentucky and especially by KRS 125.140(2).

This subsection relates to voting by machine, and the portion thereof claimed to have been violated reads: "No voter shall be permitted to receive any assistance in voting *unless he makes and signs an oath*

that, by reason of inability to read English * * * he is unable to vote without assistance. * * *" This statutory provision then specifically outlines the duties imposed upon certain precinct election officers, who are required to aid such a handicapped person to register his vote on the voting machine, after the latter makes known his need for help in the manner prescribed.

The trial court found that a high rate of illiteracy prevailed in the voting precinct involved in this contest; that 68 of the 347 persons (19.5%) who voted signed the comparative signature book with an "X"; that 50% of all the voters were given aid by the judges in voting on the voting machine; and that none of the assisted voters made or signed the oath required by KRS 125.140 (2).

The record discloses that well over one hundred persons, of the one hundred and seventy-two who were named by the contestants (appellees) in their pleadings as illegally assisted voters, were subpoenaed. Approximately one-half of these appeared; some were brought in by bench warrants and some were produced as witnesses through the efforts of a specially appointed bailiff. Those who testified brought out the fact that some of these persons would have been entitled to assistance because of their inability to read, had they requested help and made and signed the proper oath. Others who were aided appeared not to have been illiterate and were therefore not due to receive any assistance. It is conclusively established, however, as pointed out by the findings of fact, that none of those who asked for and accepted the services of the judges in casting their votes made and signed the oath in conformity with KRS 125.140 (2).

A further finding of the trial court was that eleven persons were allowed to vote whose names did not appear on the registration list, and seven persons from another precinct were allowed to vote in the precinct under scrutiny. Twenty-three other persons were challenged but were permitted to vote

after they signed affidavits; and they also were assisted by the judges without compliance with the oath provision abovementioned.

The question arises: Is the making and signing of an oath mandatory before a voter may obtain the help described in KRS 125.140(2) to enable him to vote on a voting machine?

This particular subsection has never been construed by this Court. Nevertheless, KRS 118.300(1), a similar statutory provision in respect to voting by ballot, which is still in full force and effect, requires a voter who is disabled by illiteracy and desires to vote to make oath before his ballot is marked under the conditions and in the manner set forth in that subsection; and it has been uniformly held that a failure to make the prescribed oath invalidates the vote which is later cast. See Muncy v. Duff, 194 Ky. 303, 239 S.W. 49; Marilla v. Ratterman, 209 Ky. 409, 273 S.W. 69; Allen v. Griffith, 160 Ky. 528, 169 S.W. 1003; Harrison v. Stroud, 129 Ky. 193, 110 S.W. 828, 33 Ky.Law.Rep. 653.

If it is imperative under KRS 118.300(1) that oath be made before the clerk of an election precinct marks the ballot of the voter who cannot read, or otherwise the vote may not be counted, we can perceive of no reason why the same type of voter should be excused from making and signing the prescribed oath in order to obtain help in voting by machine. We believe it is clear the Legislature intended, where illiterates are involved, to carry over the same system to voting by machine that has all along been applicable to voting by ballot. Any other conclusion would be illogical.

■ Instead of providing for the vote to be set up by the judges and then for them to withdraw so the voter can activate the machine, thus registering his vote as set up or as he sees fit in the secrecy of the booth, KRS 125.140(2) states that one of the judges shall cast the vote in the presence of the voter and the other judge. Under

these circumstances, it would appear the courts are under a duty to require that the exact terms and conditions of this law be observed when assistance must be given to a voter who is unable to read.

In the present case, as has been mentioned, the trial court found that 50% of the votes were illegal, and that those few who did testify could not say for sure, due to their illiteracy, for whom their votes were cast. It has also been shown that others who were subpoenaed would not appear as witnesses. It was impossible, the trial court found, to ascertain for whom any of the illegal votes were cast.

According to KRS 122.080(4) the courts "may adjudge that there has been no election" only "if it appears from an inspection of the whole record that there has been such fraud, intimidation, bribery or violence in the conduct of the election that neither contestant nor contestee can be judged to have been fairly elected * * *."

However, in Napier v. Noplis, Ky., 318 S.W.2d 875, one of the most recent cases on the point, it was held that, even though there be no fraud or other gross impropriety in the conduct of the election, if it has been established that a large proportion of the votes cast were illegal, and it is not possible to determine how the votes were cast so as to charge them to the recipient, the election will nevertheless be voided. This holding was predicated upon the reasoning that, when a substantial number of the votes cast was shown to be illegal, it could therefore be reasonably presumed there had been a miscarriage of so great a magnitude in the voting process as to taint the election with fraud.

We can come to no other conclusion except that the number of the illegal votes in the precinct involved in this contest was so substantial in quantity that we must declare a fair election was not held therein. See Wells v. Wallace, Ky., 337 S.W.2d 18.

Wherefore, the judgment is affirmed.